**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br>**RENEE M. THORPE,**<br>Appellant | **CIVIL ACTION**<br><br>**No. 15-5239**<br><br><br>**Bankruptcy No. 13-15267** |

## OPINION

Before the Court are the consolidated appeals from two orders by the United States

Bankruptcy Court in the Matter of Renee M. Thorpe, Debtor (Bankruptcy Case No. 13-15267).

The first appeal concerns the Bankruptcy Court's denial of Thorpe's motion to modify an

existing Chapter 12 reorganization plan on an expedited basis, or in the alternative, to clarify that

a proposed transaction would satisfy the debtor redemption provisions of the existing confirmed

reorganization plan and require cancellation of an auction of Mrs. Thorpe's family farm.  The

second appeal concerns the Bankruptcy Court's confirmation of the sale of the farm at a court-

ordered auction, despite objections from Mrs. Thorpe that irregularities in the auction process

undermined the integrity of the auction.

## I.      FACTUAL AND PROCEDURAL HISTORY

In 2010, Renee M. Thorpe ("Mrs. Thorpe") and Dale Thorpe ("Mr. Thorpe") received

notice from Susquehanna Bank that they were in default on two loans secured by mortgages on

the Thorpe Family Farm (the "Farm") in Upper Makefield Township, Newtown, Pennsylvania.

The Farm covers approximately 144 acres, and is divided by a public road.  A house and several

farm buildings are located on the north side of the road, while the portion of the Farm on the

south side of the road consists of a 47.915-acre parcel of undeveloped land (the "Parcel").

Though the Parcel has its own tax identification number and legal description, the entire Farm

was deeded together when it was first acquired by the Thorpe family in 1945, when it was conveyed within the family in 2003, and when it was conveyed to Mr. and Mrs. Thorpe in 2007.

The Thorpes and Susquehanna Bank initially attempted to resolve the Thorpes' debt through various proceedings in state court but were unable to do so. A Sheriff's sale of the Farm was originally scheduled in May 2012. That sale was cancelled as a result of a Chapter 12 petition filed by Mr. Thorpe. That case was dismissed on March 8, 2013 for failure to submit a viable reorganization plan with an order barring Mr. Thorpe from filing future bankruptcy petitions without leave of court. *In re Thorpe*, No. 12-19652 (Bankr. E.D. Pa. Mar. 8, 2013).

After the dismissal of Mr. Thorpe's bankruptcy case, Susquehanna Bank assigned the mortgages to Lititz Properties, LLC ("Lititz"). Lititz continued the effort to collect on the debt, and another Sherriff's sale was scheduled for June 14, 2013. (Appellant Br. at 11). The day before the scheduled sale, Mrs. Thorpe filed the Chapter 12 petition that eventually gave rise to the appeals at issue here. Frederick L. Reigle was appointed as the Chapter 12 Trustee (the "Trustee"). After several unsuccessful attempts to submit a confirmable reorganization plan and intense negotiation with Lititz and the Trustee, Mrs. Thorpe gained approval of a Fourth Amended Chapter 12 Reorganization Plan (the "Fourth Amended Plan") on January 23, 2014. (ECF No. 121). The Fourth Amended Plan memorialized the first iteration of what the parties and the Bankruptcy Court have described as a "grand bargain." The essence of the bargain was to allow sale of the Parcel to generate funds to pay down Mrs. Thorpe's debt and allow her to retain ownership of the remainder of the Farm. Paragraph 2(C) of the Fourth Amended Plan set out a specific schedule for marketing the Parcel. Pursuant to the schedule, Mrs. Thorpe had the first opportunity. If she was unable to "enter into an agreement for sale on or before February 15, 2014," the Trustee was authorized to market the Parcel until April 16, 2014. If neither Mrs.

2

Thorpe nor the Trustee were able to sell the Parcel within that time frame, the plan provided that "the parcel shall be sold promptly at auction."  Any sale of the Parcel, whether in a private transaction or at auction, was to be closed no later than 90 days after confirmation of the sale by the Bankruptcy Court.  The Fourth Amended Plan did not explicitly indicate whose responsibility it was subdivide the Farm to allow any conveyance of the Parcel.

Initial efforts to market the Parcel were met with some success, and on the final day permitted by the Fourth Amended Plan, Mrs. Thorpe filed a motion to sell the Parcel to Mack & Roedel, LLC for $1,300,000.  Lititz and the Trustee objected to the sale on the grounds that the agreement of sale to Mack & Roedel contained terms that conflicted with the Fourth Amended Plan, and that there were higher and better offers for the Parcel.  On April 11, 2014, the Bankruptcy Court sustained the objections, and ordered Mrs. Thorpe to enter into an agreement of sale with King's General Contracting ("King's") in the amount of $1,350,000 within seven days, with a closing no later than July 2, 2014.  (ECF No. 136).[1]  The April 11, 2014, sale order indicated that "time is of the essence" and that King's failure to meet deadlines would constitute a breach of the agreement.  Zaveta Land Holdings, LLC ("Zaveta") was established as a back-up purchaser, in the event that King's defaulted.

Despite the Bankruptcy Court's careful order and the provisions for a back-up purchaser, no sale occurred.  On April 22, 2014, King's defaulted.  Finding that neither Mack & Roedel nor Zaveta remained ready or willing to purchase the Parcel, the Bankruptcy Court ordered the Trustee to market the Parcel through September 2, 2014.  (ECF No. 155).  Linda Emerson ("Emerson") of Berkshire Hathaway Home Services Fox and Roach was approved as the realtor for sale of the Parcel.  (ECF No. 163).

---

[1] All citations to electronic docket entries (ECF) refer to the docket in Bankruptcy Case No. 13-196522 in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

Emerson's marketing efforts yielded another potential buyer for the Parcel.  On September 10, 2014, the Trustee received a signed offer to purchase the Parcel for $900,000 from Deepak and Jayshree Patel (the "Patels").  (ECF 221).  Mrs. Thorpe objected to this sale. At a lengthy hearing on September 17, 2014, the Bankruptcy Court declined to approve the sale because the price offered by the Patels was unlikely to sufficiently alleviate Mrs. Thorpe's debt service burden to allow her to eventually meet the other obligations of the Fourth Amended Plan. (ECF No. 256 at 96-97).  The deadline for submitting another amended plan was extended.

Following the rejection of the sale of the Parcel to the Patels, Lititz renewed its motion to dismiss Mrs. Thorpe's bankruptcy case.  Over the next two months, Mrs. Thorpe, Lititz, and the Trustee again engaged in extensive negotiations.  These negotiations eventually yielded the confirmation of the Fifth Amended Chapter 12 Reorganization Plan (the "Fifth Amended Plan"). (ECF No. 290).  The Fifth Amended Plan resuscitated the grand bargain, but this time provided that the entire Farm would be sold at Auction if neither the Parcel nor the Farm could be sold under a revised marketing schedule.  Under the new schedule, the Trustee would continue to market the Parcel until March 31, 2015, and would then market the entire Farm until June 30, 2015.  If those efforts did not yield a sale, an auction would be scheduled.  The specific parameters for the marketing of the Farm were set forth in paragraph 2(D) of the Fifth Amended Plan:

> The Trustee shall have until March 31, 2015, to continue to market for sale [the Parcel]. . . .  If the Parcel is not under a fully executed bonafide agreement of sale by March 31, 2015, the Trustee shall market the entire farm property for sale from April 1, 2015 through June 30, 2015.  The Trustee shall have full access to the entire farm property in connection with marketing it for sale. . . .  If the trustee has been unable to secure a buyer for the entire farm property and enter into an agreement of sale on or before June 30, 2015, the entire farm property shall be sold promptly by the Trustee at auction under terms to be approved [by the] Court by expedited motion. . . .  Notwithstanding the foregoing, the Debtor may still

4

> present offers for the sale of the Parcel after the entire farm property is
> being marketed by the Trustee.  Provided that such an offer closes
> fourteen (14) days prior to any scheduled closing date for the entire farm
> property and is in an amount sufficient to net Lititz $1 million [after
> closing costs and other expenses]. . . .  In such event, the Trustee shall
> convey the Parcel to said buyer and provisions of subparagraph 3(A)(i)
> will be implemented."[2]

Paragraph 2(D) also provided that Mrs. Thorpe could prevent an auction by paying $1,000,000

directly to Lititz at least fourteen days before the closing of any sale of the Parcel or Farm:

> Fourteen (14) day prior to the closing of the sale of the Parcel, the
> farm, or any other lesser portion of the farm, the Debtor may make a
> Plan payment to the Trustee which will net at least $1,000,000 [after
> various expenses]. . . .  If such payment is made, any pending sale of
> the Parcel, the farm, or any other lesser portion of the farm shall
> become null and void.

 Like the Fourth Amended Plan, the Fifth Amended Plan was silent concerning the responsibility

to subdivide the Farm to allow sale of the Parcel.

       The Patels continued to demonstrate interest in purchasing the Parcel, but insisted that

several contingencies be included in the agreement of sale.  Among the contingencies they

sought was the right to a refund on their deposit pending the outcome of an environmental study

or an unfavorable determination from local zoning authorities concerning the location of a

proposed home.  As a result, both parties expressed concerns about the Patels' level of financial

commitment.  The Trustee, whose responsibility it was to market the Parcel under the Fifth

Amended Plan, did not present any of the Patels' offers to the Bankruptcy Court for approval.

However, Mrs. Thorpe presented a signed offer from the Patels (the "Patel Agreement") to

purchase the Parcel for $1,200,000 to the Bankruptcy Court on April 13, 2015.  (ECF No. 420).

The Bankruptcy Court preliminarily approved the Patel Agreement on April 23, 2015, and

---

[2] Subparagraph 3(A)(i) details Mrs. Thorpe's reorganized debt service obligations to Lititz.  In the event of a sale of
the Parcel, it provides for distribution of the net proceeds to Lititz, and, if such proceeds are insufficient to
completely extinguish Mrs. Thorpe's debt, a reamortization of the reduced debt burden.

ordered that any discrepancies between the agreement and the Fifth Amended Plan should be resolved prior to closing. (ECF No. 333). Once again, the sale fell through. On May 4, 2015, the Patels notified the Trustee's broker that they would not be moving forward with the purchase, and the Bankruptcy Court approved termination of the Patel Agreement on June 4, 2015. (ECF 346, ECF 356).

Following the termination of the Patel Agreement, the Trustee moved forward with the Auction provisions of the Fifth Amended Plan. On July 31, 2015, the Bankruptcy Court issued a Final Order establishing procedures for an auction to be held on September 16, 2015 (the "Final Auction Order"). (ECF No. 434). In addition to setting forth the procedural specifications for the Auction, the Final Auction Order changed the deadline for effecting the Debtor's Redemption, described as "making a payment such that Lititz Properties nets $1,000,000," from fourteen days prior to closing to the "fall of the auctioneer's hammer" at the conclusion of the Auction. (Final Auction Order ¶ 15). As provided in the Fifth Amended Plan, the Debtor's Redemption could be effected either through direct cash payment, or a sale of the Parcel for an amount that would net Lititz $1,000,000 after accounting for applicable fees and other expenses. The Final Auction Order also provided that the Parcel could be sold separately at the Auction if Mrs. Thorpe could successfully subdivide the Parcel before August 7, 2015:

> If, on or before August 7, 2015, the Debtor is able to successfully obtain or demonstrate to the Trustee that it has the appropriate approval for subdivision of the Parcel and has had the two parcels surveyed by a licensed engineer with both parcels having their own legal descriptions (or can do so with sufficient promptness considering the need to conclude the Auction and closing in a timely manner), the Auctioneer shall offer both parcels for Auction individually as well as together.

(Final Auction Order ¶ 25). The Bankruptcy Court approved Max Spann Real Estate & Auction Co. to serve as the auctioneer for the Auction (the "Auctioneer"). Robert Dann ("Dann") was the

Auctioneer's primary coordinator for the Auction and worked with the Trustee to arrange Auction procedures in accordance with the Final Auction Order. (Sept. 17 Tr. at 116).

The Auctioneer designed and implemented a court-approved marketing strategy to publicize the auction that included open houses, printed brochures, and posting on the Auctioneer's website. The Trustee did not directly supervise the development or implementation of this strategy. (*Id.* at 118-28). On August 28, 2015, a video was posted on the web site of the *Bucks County Courier Times* in which Dann was interviewed by a reporter for the *Courier Times* concerning the Auction and said that "people are allowed to build one more house, maybe another one. That's about it. The property is not subdividable." Tracie Van Auken, Video: Thorpe Farm Auction Preview, *Bucks County Courier Times* (Aug. 23, 2015, 4:08 PM), http://www.buckscountycouriertimes.com/videos/local/video-thorpe-farm-auction-preview/html_3856df8f-ea76-54c4-92a0-d90bdbf35b93.html.

On September 10, 2015, Mrs. Thorpe filed her Motion to Modify Chapter 12 Plan After Confirmation, or in the Alternative for Clarification of Fifth Amended Plan in which she asserted that she had received an offer for the sale of the Parcel in the amount of $1,156,000. (ECF No. 460.) In that Motion, Mrs. Thorpe proposed a modified reorganization plan (the "Sixth Amended Plan") that she argued would provide an optional structure for the Debtor's Redemption "should it develop that the Trustee cannot convey the Parcel in accordance with the agreement of sale within a reasonable time after the prospective buyer closes on the sale of the Parcel by tendering funds." (ECF No. 460 ¶¶ 10, 12). The proposed Sixth Amended Plan set forth an alternative arrangement for the Debtor's Redemption in which the buyer would make a lump-sum payment to the Trustee sufficient to net Lititz $1,000,000, which would then be tendered to Lititz. In exchange, Lititz would release its security interest in the Parcel and convey

a first lien mortgage to the buyer.  (ECF No. 460, Ex. A ¶ 2(D)).  As an alternative to modifying

the Fifth Amended Plan, Mrs. Thorpe also sought "clarification" that an agreement of sale, with

a mortgage-lien alternative, was sufficient to trigger the existing Debtor's Redemption provision

of the Fifth Amended Plan and cancel the Auction.  The Bankruptcy Court conducted a hearing

on Thorpe's Motion on September 11, 2015.  At that hearing, Mrs. Thorpe presented a contract

of sale for the Parcel signed by the Damerjian Group, LLC (the "Damerjian Group"), along with

evidence of the Damerjian Group's financial ability to pay in cash.  (Appellant Br. Ex. 19).

However, during the hearing, the Trustee indicated that the Parcel could not be conveyed prior to

the Auction because the Farm was not subdivided.  (Sept. 11 Tr. at 61).

       At the conclusion of the September 11, 2015, hearing, the Bankruptcy Court denied the

Motion to Modify on grounds that the Bankruptcy Court did not have the discretion to waive the

21-day notice required for such motions under Bankruptcy Rule 9006(c)(2).  (Sept. 11 Tr. at

109).  The Bankruptcy Court also indicated that it would not exercise its discretion to reduce the

notice period, even if such discretion were permitted.  (Sept. 11 Tr. at 111).  The Bankruptcy

Court further ruled that that the Debtor's Redemption provisions of the Fifth Amended Plan

would not be satisfied by the proposed agreement with the Damerjian Group and that a

termination of the Auction was not appropriate.  The Bankruptcy Court memorialized this

decision with an Opinion read from the bench on September 11 and an Order issued on

September 14 that denied "the request for waiver of the 21 day notice period provided in Fed. R.

Bankr. P. 3015(g)" (the "September 14 Order").  (ECF No. 462).  In a separate order on

September 14, 2015, the Court set $2,358,354.32 as Lititz's credit bid maximum.  (ECF No.

463).  Mrs. Thorpe appealed the September 14 Order denying modification and its incorporated

Opinion.  (ECF No. 467).  This is the first appeal currently before the Court.

The morning of the Auction, Mrs. Thorpe unsuccessfully sought a stay of the Auction.[3]
During the Auction, Lititz made a bid for $1,000,000, but stopped bidding as other prospective
buyers continued to participate.  (Sept. 17 Tr. at 80-81).  At the conclusion of the Auction, Mr.
Patel was declared the prevailing bidder with a bid of $1,750,000.  (ECF No. 473).  He tendered
a $175,000 deposit to the Trustee and signed a contract for sale of the Farm with a closing date
no later than 30 days after entry of an order approving the sale.  (ECF No. 473, Ex. A).  Two
junior bids were certified:  The first back-up bid was a $1,725,000 cash bid from Dwight and
Susan Ely.  The second back-up bid was Lititz's $1,000,000 credit bid.  (ECF 473 at ¶ 5).

The Bankruptcy Court held a hearing on the confirmation of the sale on September 17,
2015.  Prior to the hearing, Mrs. Thorpe filed an Objection that asserted two major reasons that
the Auction should not be confirmed.  First, Mrs. Thorpe renewed her argument that the Auction
should have been terminated.  Second, Mrs. Thorpe alleged three specific irregularities with the
sale and Auction process: (1) the Trustee's real estate broker violated the Bankruptcy Court's
sealing order by disclosing the Auction provision in the Fifth Amended Plan to Mr. Patel which
allegedly caused the Patels to withdraw their offer to purchase the Parcel in the Spring of 2015;
(2) in marketing materials, the Auctioneer understated the number of homes which could be built
on the Farm; and (3) Lititz sought to increase its credit bid authority to more than $1,000,000
million higher than it actually bid at the Auction.  (ECF 474 ¶ 16).

At the September 17, 2015, hearing, the Bankruptcy Court would not permit testimony or
argument concerning the Debtor's Redemption, or any evidence concerning Mrs. Thorpe's

---

[3] On September 16, 2015, Mrs. Thorpe initially sought a stay of the September 14 Order pending appeal, including a
stay of the Auction itself, from the Bankruptcy Court.  At Mrs. Thorpe's request, the Bankruptcy Court considered
the motion without a hearing due to the exigency of the circumstances.  The Bankruptcy Court denied the request for
a stay based on what it considered a "minimal" chance of success on appeal and the hardship that would be created
by a last-minute cancellation of the Auction.  (ECF No. 470).  Mrs. Thorpe then sought the same relief via a
miscellaneous action filed with this Court less than an hour before the Auction was scheduled to begin.  By the time
this matter was brought before the emergency judge, the Auction had concluded.

allegation that Mr. Patel was informed about the eventual Auction prior to withdrawing the bid to purchase the Parcel in Spring 2015, ruling that both issues concerned the subject matter of the September 14 Order and were thus already under appeal.  (Sept. 17 Tr. at 17, 61).   Nonetheless, during background questioning concerning his participation in the Auction, Mr. Patel testified that he learned about the Auction from his real estate broker in August 2015.  (*Id*. at 42).  The Bankruptcy Court would not allow more specific questioning concerning Mr. Patel's prior knowledge of the Auction.  (Sept. 17 Tr. at 17, 60-61, 67).  The Bankruptcy Court declined to continue the September 17 hearing to allow for the collection of additional evidence and overruled all of Mrs. Thorpe's objections to the sale.  (Sept. 17 Tr. at 186).  An order memorializing the confirmation was issued on September 18, 2015 (the "September 18 Order"). Mrs. Thorpe indicated her intent to appeal and the Bankruptcy Court granted a brief stay of the confirmation order pending the first hearing before this Court.  The appeal of the September 18 Order is the second appeal now before the Court.

## II.     STANDARD OF REVIEW

Mrs. Thorpe has appealed decisions of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1), which grants the District Court jurisdiction over appeals of final orders from the Bankruptcy Court.  In its appellate role reviewing the decisions of the Bankruptcy Court, the Court generally must "review questions of law de novo, findings of fact for clear error, and exercises of discretion for abuse thereof."  *In re Jevic Holding Corp.*, 787 F.3d 173, 179 (3d Cir. 2015).  Concerning issues of mixed law and fact, the Court must "accept the [Bankruptcy Court's] finding of historical or narrative facts unless clearly erroneous, but exercise plenary review of the [Bankruptcy Court's] choice and interpretation of legal precepts and its application

of those precepts to the historical facts." *Mellon Bank N.A. v. Metro Commc'ns, Inc.*, 945 F.2d

635, 642 (3d Cir. 1991) (internal citations omitted).

## III.   DISCUSSION

### A.   *Appeal of September 14 Order*

The first appeal assigns error to the Bankruptcy Court's denial of Mrs. Thorpe's motion

to either modify the Fifth Amended Plan prior to the date of the Auction or to clarify that her

proposed sale to the Damerjian Group satisfied the Debtor's Redemption provisions of the Fifth

Amended Plan.[4]

### 1.   Denial of Modification of the Chapter 12 Plan[5]

The Bankruptcy Court denied modification of the Chapter 12 Plan on the basis that

consideration of such a modification requires 21 days' notice under Bankruptcy Rules 3015(g)

and 9006(c)(2).  Mrs. Thorpe concedes that an action to modify a confirmed reorganization plan

is governed by Bankruptcy Rule 3015(g), which imposes a 21-day notice requirement on

motions to modify a reorganization plan if a plan has already been confirmed, and that Rule

9006(c)(2) specifically lists actions under Rule 3015 as actions for which notice periods cannot

be reduced at the court's discretion.  In the Bankruptcy Court, Mrs. Thorpe did not challenge the

basic interpretation of these provisions, but instead argued that 18 U.S.C. § 105(a) grants the

Bankruptcy Court the equitable authority to waive the Rule 3015(g) notice requirement.  The

---

[4] Though the September 14 Order explicitly addresses only the modification issue, all parties agreed at oral argument that the Bankruptcy Court's decision during the September 11 hearing not to issue an order terminating the Auction was a definitive ruling on whether the proposed sale to the Damerjian Group satisfied the Debtor Redemption provision and thus should be incorporated into the September 14 Order.  The Bankruptcy Court adopted this position during the September 18 hearing in the course of ruling that all matters concerning the Debtor's Redemption were part of the first appeal.  Accordingly, the Court will consider the Bankruptcy Court's statement at the September 11 hearing that it "will not enter an order terminating the auction" to be incorporated into the September 14 Order, and thus properly appealed as a final order under 28 U.S.C. §158(a)(1).

[5] Counsel for Mrs. Thorpe indicated at oral argument that the denial of the modification based on Bankruptcy Rule 9006(c)(2) was not error and is not part of the appeal.  However, given that this was the primary subject matter of the Order from which Mrs. Thorpe appealed, and that Lititz addressed this argument in its brief, for utmost clarity, the Court will rule on this aspect of the Order.

Bankruptcy Court rejected this argument, and further held that even if discretion to reduce the notice period did exist, it would not exercise that discretion.

The Bankruptcy Court's interpretation of the interaction between Rule 9006(c)(2) and U.S.C. § 105(a) is supported by the plain language and structure of the Rule. Rule 9006(c)(1) provides that the Bankruptcy Court generally has discretion to reduce deadlines with notice and for cause, but Rule 9006(c)(2) specifically removes that discretion for certain enumerated actions, including those filed under Rule 3015. Fed. R. Bankr. P. 9006(c). This specific removal of discretion would have no effect if it could be overridden by the Bankruptcy Court's general equitable powers. Neither the parties nor the Court have located any authority that would undermine this straightforward reading of the Rule. Thus, the Bankruptcy Court's holding that it lacked discretion to reduce the notice period was not error. Furthermore, if it had such discretion, it would not have been an abuse of that discretion to decline waiver of the notice period, particularly considering the lengthy history of attempted sales and reorganizations in the bankruptcy proceedings for this case.

### 2.      Denial of Plan Clarification

Mrs. Thorpe argues in the alternative that the Auction should have been cancelled even without amending the Fifth Amended Plan because the proposed sale of the Parcel to the Damerjian Group satisfied the existing Debtor's Redemption provisions. The Bankruptcy Court rejected this argument in its Opinion from the bench on September 11 and did not order a termination of the Auction. Mrs. Thorpe appeals from that Opinion and the denial of an Order terminating the Auction.

This appeal requires a review of the Bankruptcy Court's interpretation of the Debtor's Redemption provision and the allocation of subdivision responsibility in the Fourth and Fifth

Amended Plans.  Confirmed reorganization plans are court-approved contracts.  As such, they must be analyzed through the lens of contract law.  *See In re Shenango Grp., Inc.*, 501 F.3d 338, 344 (3d Cir. 2007).  While contract interpretation is typically a matter of de novo appellate review, the Third Circuit has announced a specific hybrid standard of review in context of confirmed bankruptcy reorganization plans that "accords great weight to the Bankruptcy Court's construction of an order with which it is familiar by virtue of its direct involvement in the proceedings."  *Id*. at  346.  This hybrid standard applies de novo review to the initial question of whether a reorganization plan is ambiguous, but reviews a bankruptcy court's resolution of contract ambiguities for abuse of discretion.  *Id.*  It is widely accepted that a plan should be interpreted under the law of the state in which it was confirmed.  *See In re Turek*, 346 B.R. 350, 354 (M.D. Pa. Bankr. 2006).  Accordingly, the Court will review de novo any conclusions that the relevant portions of the Fourth and Fifth Amended Plans are ambiguous under Pennsylvania law, but will resolve any ambiguities in the Plans by "defer[ring] to the Bankruptcy Court's interpretation unless it is unreasonable under the circumstances."  *In re Shenango*, 501 F.3d at 346.

### a.  Definition of "Closing"

Mrs. Thorpe argues that her proposed sale of the Parcel to the Damerjian Group was a "closing" as contemplated by the Debtor's Redemption provision of the Fifth Amended Plan. The Bankruptcy Court disagreed, and held that a sale would only "close" upon the "unconditional delivery of the redemption amount prior to the fall of the hammer at the auction." (Sept. 11 Tr. at 94).  The Bankruptcy Court further held that a transfer of funds would be "unconditional" only if title to the Farm were actually conveyed to the buyer.  Adopting as "an undisputed fact" or "a mixed fact-law finding" that the Trustee could not convey title prior to

subdivision, the Bankruptcy Court found "no basis to believe" that closing could be completed before the conclusion of the Auction.

Mrs. Thorpe argues that the Debtor Redemption provision of the Fifth Amended Plan, which allows for cancellation of the Auction upon a sale that nets Lititz $1 million, is ambiguous concerning the meaning of the term "close." She asserts that "closing" in this context includes a transaction whereby payment would be tendered to the Trustee, but title would not be transferred until a later date after subdivision of the Parcel has been obtained. Lititz argues that "closing" is not completed until the funds have been transferred to the Trustee and the Parcel has been conveyed to the buyer.

Under Pennsylvania contract law, "clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). A contract is ambiguous only if "it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one." *Id.* To analyze potential ambiguity, the court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence in support of that meaning." *Id.*

None of the parties have cited to operative documents in this case or Pennsylvania law for a definitive interpretation of "closing." Looking to conventional authorities, the Court is similarly unable to reach an unequivocal legal definition of the term. Black's Law Dictionary defines a "closing" as a "final meeting . . . esp., in real estate, the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property are transferred." Black's Law Dictionary 311 (10th ed. 2014). However, the same dictionary defines to "close" as to "conclude discussion or negotiation about." *Id.* at 310. Thus,

14

even within a single source, there is authority supporting two distinct meanings of the term "closing": (1) a specific event during which a transaction is concluded, or (2) the general end of substantive negotiations of a transaction. Neither Lititz nor Mrs. Thorpe have cited authority that adopts a specific definition under Pennsylvania law, nor have the parties located passages in the operative documents that would resolve the ambiguity.

Turning to other evidence of the parties' intent to alleviate the ambiguity as a matter of law is also unavailing. Both the Fourth and Fifth Amended Plans were the result of what all parties and the Bankruptcy Court refer to as a "grand bargain." Under this bargain, Mrs. Thorpe had a chance to maintain ownership of a portion of the Farm by selling the Parcel to pay down a sizeable portion of her debt, while Lititz received a reasonably certain timeframe for the resolution of the outstanding debt. Both parties' interpretations of "closing" are consistent with their own interests in the bargain. Lititz favors an interpretation that maximizes the finality of the Auction process. Mrs. Thorpe favors an interpretation that provides the fewest obstacles to fulfilling the Debtor's Redemption requirements. Lititz's interpretation appears more consistent with the essence of the grand bargain (*i.e.*, to allow for a final opportunity for Mrs. Thorpe to keep part of the Farm, but with a clear deadline). However, without more definitive authority concerning the precise meaning of the language as used by the parties, the Court will not hold as a matter of law that the Fifth Amended Plan unambiguously required a conveyance of the Parcel to effect a "closing." Since the operative documents are ambiguous as a matter of law, the Court must review the Bankruptcy Court's interpretation of that ambiguity and affirm that interpretation unless it is clearly erroneous.

In its interpretation of the Debtor's Redemption provision, the Bankruptcy Court emphasized that Lititz's primary benefit from the "grand bargain" of the Fifth Amended Plan

15

was the establishment of a clear deadline that would bring the foreclosure process to an end through a court-ordered auction.  In light of this context, the Bankruptcy Court concluded that the Debtor's Redemption provision could only be satisfied by the unconditional payment of funds to Lititz.  Since payment for the sale of the Parcel would not be unconditional until the Parcel is actually conveyed, the Bankruptcy Court held that the actual conveyance of the Parcel is necessary to "close" as contemplated by the Fifth Amended Plan.  The Bankruptcy Court's interpretation is reasonable.  It is clear that the essence of the heavily negotiated "grand bargain" that produced the Fifth Amended Plan was to give Mrs. Thorpe one final chance to keep part of the Farm, while establishing an absolute deadline by which the Farm would be auctioned if the Parcel could not be sold.  Particularly in light of the history of unsuccessful reorganizations and withdrawn offers for the Parcel in this case, it is reasonable to conclude that the Fifth Amended Plan required that any proposed sale of the Parcel include actual cash payment and unconditional conveyance of the Parcel before it would be sufficient to terminate the Auction.  Accordingly, the Bankruptcy Court's interpretation that "closing" under the Fifth Amended Plan required actual conveyance is reasonable and was not error.

The Bankruptcy Court concluded, as a factual matter, that the Parcel could not be conveyed prior to the Auction.  Mrs. Thorpe appears to now be challenging this factual finding by arguing that subdivision may not be necessary to convey the Parcel.  This new argument is not supported by any evidence in the record, while there is substantial evidence that subdivision is necessary.  The Trustee testified at the September 11 hearing that the Farm could not be subdivided in time to convey the Parcel prior to the Auction.  (Sept. 11 Tr. at 83).  Mrs. Thorpe's counsel apparently assumed the necessity of subdivision at the same hearing when he asked whether enough time remained for the Trustee to "begin a process to inquire into and/or seek

subdivision of the parcel *so that it could be conveyed*." (*Id.* (emphasis added)). Furthermore, the Upper Makefield Township Code of Ordinances provides that "[n]o owner of any land in the Township or any other person shall subdivide or . . . sell lots unless and until final plans of such subdivision or development have been . . . submitted to and approved in writing thereon by the Board of Supervisors." Upper Makefield Twp., Pa., Code of Ordinances ch. 22, § 201. Mrs. Thorpe has not produced any evidence nor cited to any legal authority to refute the finding that subdivision is necessary. Thus, the Bankruptcy Court's factual finding that the Parcel could not be conveyed prior to the Auction due to a lack of subdivision is not error.

### b. Trustee's Duty to Subdivide

Mrs. Thorpe argues that, to the extent that the sale of the Parcel could not be closed due to a lack of subdivision, this obstacle to closing was created by the Trustee's failure to fulfill a duty established by the Fourth and Fifth Amended Plans to obtain subdivision. Setting aside the question of whether the Trustee's failure to fulfill subdivision obligations would warrant cancellation of the Auction even if it were proven, the Bankruptcy Court ruled that no such duty exists.

In support of her argument that subdivision was the Trustee's responsibility, Mrs. Thorpe points to paragraph 2(D) of the Fifth Amended Plan, which provides that "the Trustee shall convey the Parcel" to the buyer in the event that Mrs. Thorpe is able to close on a sale of the Parcel that nets Lititz $1 million. She argues that obtaining any necessary subdivision is implicitly included in the responsibility to "convey" the Parcel, and that this responsibility continued during the weeks leading up to the Auction because the Final Auction Order preserved Mrs. Thorpe's right to exercise the Debtor's Redemption. The Trustee and Lititz disagree with this interpretation. Furthermore, they note that pursuant to paragraph 25 of the Final Auction

Order, the only method by which the Parcel could have been sold separately at the Auction was "[i]f on or before August 7, 2015, the Debtor is able to successfully obtain or demonstrate to the Trustee that it has the appropriate approval for the subdivision of the Parcel and has had the two parcels surveyed by a licensed engineer with both parcels having their own legal descriptions (or can do so with sufficient promptness considering the need to conclude the Auction and closing in a timely manner)."  (Appellant Br. Ex. 15 ¶ 25).

The Final Auction Order leaves ambiguity concerning responsibility for subdivision for any purpose other than preparation for the Auction.  The text does not indicate whether subdivision responsibility for the Auction was allocated to Mrs. Thorpe as an exception to an existing obligation of the Trustee, to set a deadline for Mrs. Thorpe to obtain a subdivision for which she had sole responsibility in the first place, or clarify a previously unresolved duty.  The Fourth and Fifth Amended Plans do not address which party was responsible for subdividing the Farm for a private sale, and no background legal principles have been presented to establish that either a trustee or a debtor bears the general obligation to subdivide when a reorganization agreement provides for the sale of a portion of the debtor's property.  Thus, the allocation of subdivision responsibility in the event that Mrs. Thorpe found a willing buyer for the Parcel is ambiguous from a holistic reading of the operative documents.  The Court must defer to Bankruptcy Court's resolution of this ambiguity unless it is unreasonable.

The Bankruptcy Court found Mrs. Thorpe's argument that the Trustee had a duty to anticipate a private sale and pre-emptively obtain subdivision to be "disingenuous" and "close to outrageous" because Mrs. Thorpe had controlled efforts to market and sell the Parcel throughout most of the bankruptcy process.  Furthermore, beginning on April 1, 2015, when the Trustee began to market the entire Farm, it was once again only Mrs. Thorpe who retained the right to

18

market the Parcel.  The Bankruptcy Court's reasoning is compelling.  Furthermore, Mrs.

Thorpe's argument is undermined by the provision in the Final Auction Order requiring Mrs.

Thorpe to obtain subdivision herself if she wanted the Parcel to be sold separately at Auction.

Requiring Mrs. Thorpe to subdivide the Farm for the Auction would be unnecessary if the

Trustee already had a duty subdivide.  Additionally, requiring Mrs. Thorpe to obtain subdivision

for an Auction managed by the Trustee but not for a private sale to a buyer she located herself

would be an illogical allocation of responsibilities that the Court will not read into the lacunae of

the operative documents.  Finally, the fact that the Final Auction Order specifically addresses

subdivision for the purpose of the Auction and requires more than one month of notice of such

subdivision emphasizes that the Bankruptcy Court and the parties were aware of the time

constraints for completing the subdivision process before the Auction, yet did not explicitly

impose any duty on the Trustee.  In sum, there is no direct evidence in the operative documents

of a duty to subdivide on the part of the Trustee, and there is persuasive indirect evidence that no

such duty existed.  Accordingly, the Bankruptcy Court's ruling that the Trustee had no duty to

subdivide in anticipation of a private sale of the Parcel was not error.  The Bankruptcy Court's

September 14 Order shall be affirmed.

**B.**     ***Appeal of September 18 Order***

In her appeal of the September 18 Order confirming the Auction sale, Mrs. Thorpe does

not challenge the legality of the Auction procedures or the Bankruptcy Court's interpretation of

the Auction procedures.  Rather, she alleges that there were irregularities in the administration of

the Auction that tainted the process and prevented the Auction from fulfilling its objective of

maximizing the value of the assets.[6]  These objections present entirely factual questions, and the Court will review the Bankruptcy Court's confirmation of the Auction sale for clear error.

<h3 style="text-align:center">1.    Violation of Sealing Order</h3>

Mrs. Thorpe contends that during Spring 2015, while the Fifth Amended Plan was sealed by court order, Emerson informed Mr. Patel that there would be an Auction for the entire farm if no private sale of the Parcel occurred.  Mrs. Thorpe argues that this alleged leak of then-confidential information caused Mr. Patel to withdraw his bid for the Parcel.  The Bankruptcy Court ruled that this objection did not address the regularity of the Auction process, and did not permit Mrs. Thorpe to pursue this issue at the September 17 hearing.  Mrs. Thorpe assigns this as error.

The Bankruptcy Court's refusal to hear evidence on this issue notwithstanding, Mr. Patel testified that he learned about the Auction from his own broker in mid-August 2015, after the Fifth Amended Plan was unsealed.  Thus, the only evidence in the record suggests that Mr. Patel did not know about the Auction until long after he withdrew his bid for the Parcel and the Fifth Amended Plan was unsealed.  Mrs. Thorpe's offer of proof on the matter at the September 17 hearing was vague concerning when this alleged breach of confidentiality occurred or what evidence Mrs. Thorpe would be able to produce to show that it happened.  However, the details of the alleged breach of the sealing order do not matter.  The Bankruptcy Court's refusal to hear

---

[6] In objecting to the confirmation, Mrs. Thorpe renewed her argument that the Auction should have been cancelled because she had satisfied the Debtor's Redemption provision.  The Bankruptcy Court ruled that this issue was already the subject of an appeal and thus outside the Bankruptcy Court's jurisdiction.  To the extent that Mrs. Thorpe incorporates these arguments in her appeal of the September 18 Order and assigns error to the Bankruptcy Court's refusal to hear further testimony on September 17, the Court finds no error.  Even if it were error to rule that all matters relating to Debtor's Redemption were encompassed by the first appeal, this would be harmless error.  *See Brand Mktg. Grp. LLC v. Intertek Testing Servs. N.A., Inc.*, No. 14-3010, 2015 WL 5255078, at *12 (3d Cir. Sept. 10, 2015) ("An error is harmless if it is highly probably that it did not affect the outcome of the case.") (internal citations omitted).  The Bankruptcy Court had already ruled that the proposed sale to the Damerjian Group did not satisfy the Debtor's Redemption provision based on an extensive examination of the parties' arguments and the evidence on September 11.  There is no reason to believe that entertaining the same arguments again six days later would have led to a different ruling on the substance of the issue.

evidence on this issue is not error for the same reason that the Bankruptcy Court stated in the September 17, 2015 hearing: whether or not Patel knew about the Auction in the Spring of 2015 is not relevant for evaluating the integrity of the Auction.  There is no logical explanation for how learning about the Auction at an earlier date could have decreased the amount Patel was willing to bid for the Farm at the Auction.

> 2.    **Marketing Errors**

As her second objection to the Auction, Mrs. Thorpe contends that the marketing of the Auction was plagued by inaccuracies and carelessness that diminished interest in the Auction and depressed the amount that potential buyers were willing to bid.  This objection is much more logically sound than the other two objections.  As a hypothetical matter, if the marketing were inaccurate and serious potential buyers relied on these inaccuracies resulting in lower bids, the integrity of the Auction might be undermined and there could be serious questions concerning the propriety of confirming the sale.  However, there is no evidence that this occurred.  Mrs. Thorpe has produced only two examples of inaccurate marketing, both from the *Bucks County Courier Times*.  First, Mrs. Thorpe points to a video posted on the website for the *Courier Times* in which Robert Dann, the representative of the Auctioneer responsible for conducting the sale, comments that "people are allowed to build one more house, maybe another one."  Second, she notes that the *Courier Times* published the wrong time for the Auction, allegedly because of confusing marketing materials produced by the Auctioneer.

Mrs. Thorpe assigns as error the Bankruptcy Court's refusal to continue the September 17 hearing to allow her the opportunity to present at least three witnesses to further develop the record concerning the alleged marketing errors and their effect on the Auction.  This was not error.  The Bankruptcy Court ruled that, as a factual matter, even if Mrs. Thorpe were able to

support her offers of proof concerning marketing errors with admissible testimony, the evidence would still not support the conclusion that the errors materially impacted the outcome of the Auction.  This conclusion was informed primarily by the nature of the alleged errors and the unlikelihood that serious potential buyers would rely on local news coverage and marketing materials in assessing the value of the land.  The marketing statements in question allegedly understated the Farm's capacity for development by one house, though the Bankruptcy Court expressed some doubt about this, given that the portion of the Farm eligible for development contains a prominent cell phone tower and may be an undesirable location for a residence.  In any case, any developer seeking to develop the property would be aware if there was potential for additional residences, and the Bankruptcy Court concluded that the specific number of houses mentioned in the marketing materials, even if inaccurate by one, would not materially impact developers' interest in the property.  More importantly, it is likely that developers considering the purchase of real estate in excess of $1,500,000 would conduct their own due diligence concerning the potential for building homes on the Farm and any mistakes in the marketing materials would be ignored in favor of the results of that due diligence.  On this record, it was not unreasonable for the Bankruptcy Court to have found that understating the capacity of the Farm for future residential development by one house would have, at most, a *de minimus* impact on the success of the Auction.

A second basis on which it was not error to decline to continue the hearing for the introduction of more evidence is the fact that Mrs. Thorpe did not raise her concerns about the marketing materials until the September 17 hearing, and even then she was unable to produce specific evidence of the impact of the allegedly mistaken materials.  Mrs. Thorpe's counsel acknowledged that Mrs. Thorpe became aware of the alleged misrepresentation as early as

September 9.  Yet she did not address any concerns about inaccurate marketing two days later at

the September 11 hearing.  No objection was filed along with her Emergency Stay of the Auction

on September 16.  Given the above, it was not error to conclude that the alleged marketing

errors, even if true, did not materially undermine the integrity of the Auction.

### 3.      Lititz's Bidding Irregularities

As her final objection, Mrs. Thorpe argues that the eventual Auction price was deflated

by Lititz's credit bidding process.  The precise logic behind this objection is unclear, but it

appears to be based on an anecdote that one bidder became suspicious about Lititz's view of the

true value of the Farm when he recognized counsel for Lititz at the Auction and saw him bid

only once at $1,000,000, after seeing the same counsel argue at the September 11 hearing for an

increased credit bid allowance.  There are two fatal flaws to this objection.  First, despite this

anecdote from Mrs. Thorpe's counsel at oral argument before this Court, there is no evidence in

the record that any bidders knew that Lititz was bidding, knew the amount of Lititz's bid, or

drew any inference about the value of the property even if they did know about Lititz's bidding

behavior.  Mrs. Thorpe assigns as error that the hearing was not continued to allow for further

development of the record in this regard.  However, this is not error because Lititz's lawful

bidding behavior is not a basis for invalidating the Auction, even if it did cause other bidders to

draw inferences about the value of the Farm.  Mrs. Thorpe does not contend that Lititz undertook

this bidding strategy in an effort to diminish the value of the Auction.  Similarly, there is no

suggestion that Lititz increased its credit bid allowance in bad faith.  Indeed, there is no question

that Lititz was within its legal right to stop bidding at $1,000,000 (or to not bid at all).  Lititz had

no more duty to bid than any other prospective buyer, and its bidding behavior on its face

amounts to a lawful business decision not to aggressively pursue the Farm at the Auction.  Even

if every bidder at the Auction drew an inference about the value of the Farm from Lititz's bidding behavior, this would not undermine the integrity of the Auction process.  Accordingly, the Bankruptcy Court's decision not to continue the hearing to develop the record on this issue was not error.

Finally, Mrs. Thorpe argues that even if none of her objections to the Auction taken alone justify the invalidation of the Auction sale, the alleged irregularities considered together taint the Auction such that the sale should not be confirmed.  The Court disagrees.  Mrs. Thorpe's allegation concerning a leak of the Fifth Amended Plan is irrelevant to the integrity of the Auction procedures and Lititz's business decision not to bid more than $1,000,000 at the Auction is not an irregularity.  Accordingly, the alleged marketing inaccuracies stand alone as the only objection that truly concerns the integrity of the Auction process.  As discussed above, it was not error to overrule this objection, nor was it an abuse of discretion to deny further evidentiary proceedings.  The Bankruptcy Court's September 18 Order shall be affirmed.

Dated: October 9, 2015

                             **BY THE COURT:**

                             **/S/WENDY BEETLESTONE, J.**

                             _____

                             **WENDY BEETLESTONE, J.**